(110 So. 299)

### FURST et al. v. SHOWS et al.
### (4 Div. 255.)

(Supreme Court of Alabama. Oct. 28, 1926.)

**1. Guaranty** ⬤⟿87.

Defense of payment for goods by buyer, for whom defendants were guarantors, was properly presented under general issue without special plea of payment.

**2. Guaranty** ⬤⟿27.

Guarantor is bound only to extent and in manner stated in his contract of guaranty.

**3. Guaranty** ⬤⟿53(1).

Within contract for sale by sellers to buyer for resale to customers of "their products," goods manufactured by others and bought by sellers, who became sole distributors thereof, held included, so that sale of such to buyer was not a variation from contract, which would relieve his guarantors.

**4. Guaranty** ⬤⟿92(1).

Question as to payment for goods purchased by buyer, for whom defendants were guarantors, held for jury.

**5. Intoxicating liquors** ⬤⟿327(1).

Lemon and orange extracts containing 85 per cent. alcohol held legitimate articles of merchandise.

**6. Intoxicating liquors** ⬤⟿327(1).

Sale of lemon and orange extracts containing 85 per cent. alcohol for beverage purposes is violation of both state and federal laws.

**7. Intoxicating liquors** ⬤⟿329(1).

Seller of lemon and orange extracts containing alcohol to buyer for resale would not ordinarily be chargeable with notice that resales were for beverage purposes, nor would such sales be a defense to suit for purchase price.

**8. Commerce** ⬤⟿40(1).

Where delivery of goods, as contemplated by contract, is to buyer in a foreign state, transaction is interstate.

**9. Intoxicating liquors** ⬤⟿327(1).

Validity of entire contract for sale of goods held not affected by illegality of sale of lemon and orange extracts containing alcohol for beverage purposes, if so sold.

**10. Guaranty** ⬤⟿26—Whether sale of extracts containing alcohol was made with knowledge of buyer's intended illegal use held for jury, in action on guaranty of price (Volstead Act, tit. 2, § 4 [U. S. Comp. St. § 10138½b]).

Whether sellers sold lemon and orange extracts containing alcohol under circumstances from which they might reasonably deduce buyer's intention to use them for purposes illegal under Volstead Act, tit. 2, § 4 (U. S. Comp. St. § 10138½b), held for jury, in action against guarantors of purchase price.

**11. Intoxicating liquors** ⬤⟿329(2)—Scintilla doctrine prevails and applies to whether seller of extracts should have inferred buyer's intention to resell as beverage as affecting jury questions.

In determining whether sales of extracts containing alcohol were sold under circumstances from which seller might reasonably deduce intention of buyer to use them for beverage purposes, question, in action on guaranty of purchase price, was whether evidence was sufficient for jury; scintilla doctrine prevailing in Alabama.

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

12. Guaranty ☞92(2)—Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, refusing to charge that sale was legal, in absence of notice of buyer's intent to make such use, was reversible error (Volstead Act, tit. 2, § 4 [U. S. Comp. St. § 10138½b]).

Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, refusing to charge that sale was legal, in absence of notice of buyer's intent to make such use, was reversible error; "notice" being equivalent to "under circumstances from which the seller might reasonably deduce" unlawful intention, found in Volstead Act, tit. 2, § 4 (U. S. Comp. St. § 10138½b).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Notice.]

13. Guaranty ☞92(2)—Instruction that buyer's guarantors had burden of showing that seller of extracts containing alcohol had notice of buyer's intent to use them for beverage purposes should have been given.

Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, instruction that sales were legal, in absence of notice of buyer's intent to make such use, and placing burden of proving it on guarantors, should have been given.

14. Guaranty ☞25(2)—Where buyer's guarantors claimed that seller of extracts containing alcohol had notice of buyer's intent to use them for beverage purposes, seller's knowledge that they were intoxicating, size of bottles, and bottles were admissible.

Where buyer's guarantors claimed that sale of extracts containing alcohol were illegal because of seller's notice that they were to be used for beverage purpose, seller's knowledge that extracts were intoxicating, size of bottles in which sold, and some of bottles *held* admissible.

15. Guaranty ☞25(2)—Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, testimony elicited on cross-examination that extracts were manufactured and plaintiff's business housed in same building was admissible.

Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, admitting testimony elicited on cross-examination that extracts were manufactured and seller's business housed in same building was not error, though testimony would be irrelevant as original evidence.

16. Appeal and error ☞1050(1)—Guaranty ☞90.

Evidence of lack of notice to guarantors of buyer, that buyer was in arrears, was immaterial and prejudicial when guarantors had waived notice.

17. Appeal and error ☞1050(1)—Guaranty ☞90.

Evidence that buyer's guarantors did not know size of buyer's account and had no notice sellers claimed anything from him was immaterial and prejudicial when guarantors had waived notice.

18. Guaranty ☞90.

Evidence as to whether buyer sold goods for cash or credit was immaterial as concerns liability of his guarantors; contract having nothing concerning it.

19. Appeal and error ☞1050(1) — Guaranty ☞90.

Evidence as to whether buyer owned property and what profit he would make on sale was immaterial and prejudicial, in action against buyer's guarantors.

20. Guaranty ☞25(2).

Where buyer's guarantors claimed that sales of extracts containing alcohol were for beverage purposes, testimony of witness, who had charge of sales, as to notice that extracts would be so used, was improperly excluded.

21. Guaranty ☞25(2).

Where guarantors of buyer of extracts containing alcohol claimed sales were for beverage purposes, evidence to show reasonable needs of extracts and usual size bottles was admissible.

22. Sales ☞71(3).

In sales contract providing for sale by seller to buyer for resale of seller's products in "reasonable quantities," "reasonable quantities" referred merely to discretion of sellers.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Reasonable Quantities.]

23. Appeal and error ☞1040(13).

Overruling demurrer to plea eliminated by affirmative charge for plaintiffs, as to it was not prejudicial error.

Appeal from Circuit Court, Crenshaw County; A. E. Gamble, Judge.

Action by Frank E. Furst and another, partners doing business under the name of Furst & Thomas, against T. W. Shows and another. From a judgment for defendants, plaintiffs appeal. Reversed and remanded.

The contract sued on is as follows:

"This contract, made and entered into at Freeport, Ill., this 27th day of January, 1919, by and between Frank E. Furst and Fred G. Thomas, copartners doing business under the name of Furst & Thomas, of Freeport, Ill., and D. O. Shows, of Luverne, Ala., hereinafter called the salesman, witnesseth:

"That upon acceptance of this contract, Furst & Thomas agree to thereafter, unless prevented by strikes, fires, accidents, or other cause beyond their control, sell and deliver to the said salesman on board cars, at Freeport, Ill., or at their option from their nearest branch warehouse, at their current wholesale prices, their products in reasonable quantities as ordered by him, so long as this contract is in force and his accounts are in a satisfactory condition. Furst & Thomas also agree to give the salesman free advice and suggestions through bulletins, booklets, and letters as to the best methods of selling to consumers the goods purchased by him under this contract, but it is expressly agreed that nothing contained in such advice and suggestions shall be binding upon the salesman nor

shall be construed as in any way altering or modifying the terms of this contract.

"The salesman agrees to pay Furst & Thomas the regular wholesale price for all goods sold to him under this contract in the following manner, to wit: On the installment plan, by paying to said Furst & Thomas in cash each week a sum equal to not less than one-half his total cash sales and collections from such goods during said week; provided that the salesman may be required at the option of Furst & Thomas to pay not less than the wholesale price of certain products designated by them and sold by him for cash or collected for during said week; provided that, by paying his account in full on or before the 10th day of each month, said salesman shall receive a discount of 3 per cent.; if he remits cash in full with each order, he shall receive a discount of 5 per cent. from their current wholesale prices.

"As a matter of good faith and to show what the receipts of his business are from week to week, he agrees to send to Furst & Thomas each week a correct and fully itemized record of his business on forms provided for that purpose by them. Either party shall have the right to terminate this contract by giving written notice to the other party; provided that, if the sale or purchase of goods under this contract be permanently discontinued for any reason, it is thereby terminated, and, upon its termination from any cause by either party, the salesman agrees to settle within three months the balance due said Furst & Thomas on account; provided that the salesman shall have the privilege of returning promptly after termination of contract to Furst & Thomas, at Freeport, Ill., by prepaid freight, his stock of unsold goods, and for all goods so returned by the salesman in original, unopened bottles and packages, Furst & Thomas agree to allow credit at the price originally charged after deducting the cost of checking, handling, and putting such goods back into stock, and if on final accounting any balance is due the salesman to pay the same promptly.

"This contract is subject to acceptance by Furst & Thomas at their home office in Freeport, Ill., and shall be in force and effect from date of shipment of the first order of goods to the salesman.

"Feb. 13, 1919.

"Salesman sign here in ink:
"[Signed] D. O. Shows.
"Accepted at Freeport, Ill.
"Furst & Thomas.

"For and in consideration of the payment of $1.00, the receipt whereof is hereby acknowledged and the extension of credit to the above-named salesman by Furst & Thomas, we, the undersigned, jointly and severally guarantee to them the faithful performance of this contract by him and payment of goods furnished to him on credit, as provided by the above agreement, waiving acceptance of this guaranty and all notice, and we agree that the written acknowledgment of his account by the said salesman shall bind us, and that any extension of time shall not release us from liability hereon, and we further agree that, upon three months from the termination of the above agreement by either party and the nonpayment of his account by said salesman, this guaranty shall become absolute as to the amount due from him, and upon demand we promise to pay the amount due

Furst & Thomas without any proceeding being taken by them against the said salesman.

"Guarantors sign here in ink:

| "Name. | Occupation. | P. O. Address. |
|---|---|---|
| "T. W. Shows. | Banker. | Luverne, Ala. |
| "J. H. Shows. | Farmer. | Luverne, Ala." |

The following charges were refused to plaintiffs:

"No. 26. I charge you, gentlemen of the jury, that, if you believe, from the evidence in this case, that the extracts which were sold by Furst & Thomas to D. O. Shows were sold by Furst & Thomas to D. O. Shows in another state and were shipped by Furst & Thomas from another state to D. O. Shows in the state of Alabama, then the sale of said extracts by Furst & Thomas to D. O. Shows constituted interstate commerce. And I further charge you that, if you believe from the evidence in this case that the said extracts which were sold by Furst & Thomas to D. O. Shows contained only the necessary quantity of alcohol to compound and preserve them for domestic use, then the sale of said extracts by Furst & Thomas to the said D. O. Shows was lawful, although you may further believe from the evidence in this case that the said D. O. Shows, after said extracts were received by him in the state of Alabama, sold said extracts in violation of the laws of the state of Alabama, unless you further believe from the evidence in this case that Furst & Thomas sold and shipped said extracts to D. O. Shows with notice or knowledge that the said D. O. Shows, after said extracts were received by him in the state of Alabama, would sell, or intended to sell, the said extracts in violation of the laws of the state of Alabama."

"No. 29. I charge you, gentlemen of the jury, that, if you believe from the evidence in this case that the extracts which were sold by Furst & Thomas to D. O. Shows contained only the necessary quantity of alcohol that was necessary to properly dissolve the flavoring oils and retain them in solution, then the sale of said extracts by Furst & Thomas to the said D. O. Shows was lawful, although you may further believe from the evidence in this case that, after said extracts were received by D. O. Shows, some persons bought some of the extracts from D. O. Shows and used same for beverage purposes and became drunk upon same, unless you further believe from the evidence that the said D. O. Shows sold the said extracts to said persons for beverage purposes, and unless you further believe from the evidence in this case that, at the time that Furst & Thomas sold said extracts to D. O. Shows, Furst & Thomas had notice or knowledge that the said D. O. Shows, after said extracts were received by him would sell, or intended to sell, the said extracts as intoxicating beverages. And I further charge you that the burden of proof is upon the defendants to reasonably satisfy you by the evidence in this case that the said D. O. Shows sold said extracts to said persons as intoxicating beverages. And I further charge you that the burden of proof is upon the defendants to reasonably satisfy you by the evidence that, at the time that Furst & Thomas sold said extracts to D. O. Shows, they had notice that the said D. O. Shows, after said extracts were received by him, would sell, or intended to sell, the said extracts as

intoxicating beverages. And I further charge you that if you are not reasonably satisfied by the evidence in this case either that D. O. Shows sold said extracts to said persons as intoxicating beverages or that Furst & Thomas, at the time they sold said extracts to D. O. Shows, had notice or knowledge that the said D. O. Shows, after said extracts were received by him, would sell, or intended to sell, the said extracts as intoxicating beverages, then the sale of the said extracts by Furst & Thomas to D. O. Shows was lawful."

Emmet S. Thigpen, of Andalusia, and Calvin Poole, of Greenville, for appellants.

Plaintiffs' witness Wolfe should have been permitted to testify that neither witness nor plaintiffs had any notice or knowledge that the salesman would sell the extracts for other than culinary purposes. Somerall v. Citizens' Bank, 211 Ala. 630, 101 So. 429; Bluthenthal v. McWhorter, 131 Ala. 642, 31 So. 559; Id., 136 Ala. 568, 33 So. 552, 96 Am. St. Rep. 43. The sale of extracts was valid, and plaintiffs are entitled to recover therefor. Harper v. State, 91 Ark. 422, 121 S. W. 737, 25 L. R. A. (N. S.) 669, 18 Ann. Cas. 435. Even though plaintiffs had notice or knowledge that the salesman was purchasing the extracts to be sold as beverages in violation of the law, this would not render the transaction between plaintiff and the salesman illegal; there must have been some participation by plaintiffs in the illegal act, to render the transaction illegal. Bluthenthal v. McWhorter, supra; Humphrey v. State, 16 Ala. App. 244, 77 So. 82; Id., 201 Ala. 697, 77 So. 1001; Volstead Act, § 4(E); 17 A. & E. Ency. Law (2d Ed.) 312; Young v. State, 137 Miss. 188, 102 So. 161, 36 A. L. R. 717; Davisson v. Newton, 137 Miss. 188, 102 So. 161, 36 A. L. R. 717; Reeves Gro. Co. v. State (Miss.) 103 So. 425; McConnon v. Meadows, 138 Miss. 342, 103 So. 7; Intoxicating Liquor Cases, 25 Kan. 751, 37 Am. Rep. 284; Carl v. State, 87 Ala. 17, 6 So. 118, 4 L. R. A. 380; 23 Cyc. 338; Blakemore on Prohibition, 203. A special plea of payment is demurrable, on the ground that it presents no defense not available under the general issue. Huckaby v. McConnon & Co., 213 Ala. 631, 105 So. 886.

Frank B. Bricken, of Luverne, and Powell & Hamilton, of Greenville, for appellees.

A part of the goods sold was intoxicating beverages, which fact was known by appellants at the time of sale. This part of the consideration of the contract was illegal, and rendered the entire contract void. Under the original contract, appellants agreed to sell D. O. Shows their products; the goods sold were not produced or manufactured by appellants. Appellees have the right to stand on the strict letter of the contract between appellants and D. O. Shows. Fed. Stat. Ann. Sup. 1919, p. 206; Fed. Stat. Ann. Sup. 1922, p. 550; State v. National, etc.,

Ass'n, 192 Iowa, 629, 185 N. W. 145; Wadsworth v. Dunnam, 117 Ala. 661, 23 So. 699; Armstrong v. Walker, 200 Ala. 364, 76 So. 280; Pacific Guano Co. v. Mullen, 66 Ala. 582; 2 Michie's Ala. Dig. 329; 13 Michie's Ala. Dig. 315; Manatee County Bank v. Weatherly, 144 Ala. 655, 39 So. 988; McGeever v. Terre Haute Brewg. Co., 201 Ala. 290, 78 So. 66; National City Bank v. Seattle National Bank, 30 A. L. R. 347, note 353–358.

GARDNER, J. This suit by appellants against appellees is based upon a contract of guaranty, executed by T. W. and J. H. Shows, guaranteeing to the plaintiffs the payment for goods sold by plaintiffs to one D. O. Shows, pursuant to a written contract entered into between plaintiffs and D. O. Shows, and on which sheet of paper was also the contract of guaranty here sued upon. In this latter contract acceptance of guaranty and all notice were waived, and a further stipulation that upon expiration of three months from the termination of the contract with D. O. Shows, and nonpayment of his account, the guaranty should become absolute. The contract of guaranty is reproduced in the report of the case, and appears to be of similar import to that considered in the recent case of Huckaby v. McConnon, 213 Ala. 631, 105 So. 886.

[1] The D. O. Shows contract, with the guaranty contract thereon duly signed, was received and accepted by plaintiffs at Freeport, Ill., on February 13, 1919. The contract with D. O. Shows was terminated, pursuant to its terms, on May 20, 1921. Plaintiffs insist that upon the termination of said contract D. O. Shows was due $1,289.08. The total value of all goods shipped was $2,353.67. There was no controversy as to the amount of goods purchased. The defendants insisted that D. O. Shows had paid all that was due—a defense properly presented in this character of suit under the general issue, and as to which no special plea of payment was necessary. Huckaby v. McConnon, supra.

The defendants further insist as a defense that a portion of the goods sold by plaintiffs to D. O. Shows consisted of lemon and orange extract, containing 85 per cent. alcohol, was intoxicating, and sold under circumstances as to be violative of the law, both state and federal, and that, therefore, the entire contract was avoided thereby, citing Wadsworth v. Dunnam, 117 Ala. 661, 23 So. 699; Armstrong v. Walker, 200 Ala. 364, 76 So. 280.

The trial court, however, clearly interpreted this character of evidence as applying only to the sales of such extract if found to be in violation of law, and confined the issue to a nonrecovery for such goods if so found by the jury, and to a reduction only of the amount claimed to be due, and not as

affecting the validity of the entire contract. Upon the issues as thus indicated, the cause was submitted to the jury, resulting in a verdict for the defendants.

[2, 3] It is here further urged by defendants that no recovery can be had against them as guarantors under the undisputed proof, because of a material variance by plaintiffs from the terms of the contract with D. O. Shows, upon which the guaranty was based, and authorities are cited to the effect that a guarantor is bound to the extent and in the manner stated in his contract of guaranty, and no further. Manatee Nat. Bank v. Weatherly, 144 Ala. 655, 39 So. 988; Nat. City Bank v. Seattle Nat. Bank, 121 Wash. 476, 209 P. 705, 30 A. L. R. 347, and note; Bank of Italy v. Merchants' Nat. Bank, 236 N. Y. 106, 140 N. E. 211. The general principle of law stated in these authorities is well recognized, but we are of the opinion these authorities are without application here.

In the contract with D. O. Shows plaintiffs agreed to sell and deliver to him "on board cars at Freeport, Ill., or at their option from their nearest branch warehouse, at their current wholesale prices, their products in reasonable quantities as ordered by him."

It developed in the proof that the goods sold said Shows were manufactured by Furst-McNess Company, and sold by them to plaintiffs, who were sole distributors thereof, and the insistence is that the goods were in fact not the products of plaintiffs, but of Furst-McNess Company, the manufacturers.

We are cited to the definitions of the word "products" as found set forth in one of our opinions in the case of Elder v. State, 162 Ala. 41, 50 So. 370. But the word here is to be construed in connection with the context which indicated no particular manufacture. Where the goods were bought by plaintiffs, who became the sole distributors thereof, they became, within the meaning of the contract, the products of plaintiffs, and the conduct and dealings between the parties indicate that it was so understood. Bank of Italy v. Merchants' Nat. Bank, supra. We are of the opinion this insistence is without merit.

[4] Upon the defense of payment, plaintiffs insist they were entitled to affirmative instructions in their favor. D. O. Shows testified that the account was paid. His wife testified as to the receipt of plaintiffs showing payment. The contention of plaintiffs rests largely upon detailed testimony on cross-examination of these witnesses, reflecting, as is insisted, upon the credibility of the same and its unsatisfactory and inconclusive character. We are persuaded, however, that whatever may be said in this regard (as to which we do not feel called upon at this time to express an opinion) the testimony of those two witnesses made the question of payment one for the jury's consideration.

[5] As to the lemon and orange extract, the evidence discloses that 85 per cent. of these extracts was alcohol, and plainly so labeled on the bottles. Lemon extract is the flavoring extract from oil of lemon, or from lemon peel, or both, and contains not less than 5 per cent. of volume of oil of lemon. The orange extract is the flavoring extract from oil of orange, or from orange peel, or both, and contains not less than 5 per cent. of volume of oil of orange. The evidence is without dispute that 85 per cent. of alcohol is necessary for the dissolution of these oils and holding in solution. These extracts are recognized by the federal government as food products and permits were issued to Furst-McNess Company, the manufacturer, by the federal government specifically authorizing the use of 85 per cent. alcohol in these extracts. The Volstead Act, tit. 2, § 4, expressly provides for the manufacture and sale of such flavoring extracts that are unfit for use as a beverage or for intoxicating beverage purposes. U. S. Compiled Stat. 1923, Cum. Supp. § 10138½b. That these extracts are well-known articles of merchandise, having a legitimate use for flavoring purposes, is not controverted by counsel for defendants. Their manufacture in the instant case is not only permitted by the government authorities, but their legitimate use for culinary purposes has been long recognized by the authorities. Intoxicating Liquor Cases, 25 Kan. 75, 37 Am. Rep. 284; Carl v. State, 87 Ala. 17, 6 So. 118, 4 L. R. A. 380; W. T. Rawleigh Co. v. Rutkowski et al. (Minn.) 209 N. W. 625; Walker v. Dailey, 101 Ill. App. 575; McConnon v. Meadows, 138 Miss. 342, 103 So. 7; Young v. State, 137 Miss. 188, 102 So. 161, 36 A. L. R. 717; Humphrey v. State, 16 Ala. App. 244, 77 So. 82; Id., 201 Ala. 697, 77 So. 1001; Joyce on Intoxicating Liquors, 44.

The question is fully discussed in the foregoing authorities, and needs no repetition here.

At the time of the contract between plaintiffs and D. O. Shows and defendants these extracts were legitimate articles of merchandise. Plaintiffs had agreed to sell said D. O. Shows their products, including numerous articles, and among them were these extracts.

Speaking of the alcoholic content of preparations of this character in connection with the prohibition law then in force in the state of Kansas, Justice Brewer, speaking for the court in Intoxicating Liquor Cases, supra, said:

"Alcohol is the intoxicating principle, the basis of all intoxicating drinks. Whatever contains alcohol will, if a sufficient quantity be taken, produce intoxication. * * * But when we come to inquire as to the liquors which con-

tain alcohol, we find a lengthy list of fluids which are never used as beverages. Cologne, extract of lemon, bay rum, paregoric, tincture of gentian, and many other medical preparations contain alcohol, and all will produce intoxication. They are seldom used as a beverage, and yet they may be. Intoxication produced by drinking bay rum has been known. Yet few will drink it. Its uses are for the toilet. * * * The possibility of a different and occasional use does not change their recognized and established character. A particular spade may be fixed up for a parlor ornament, but the spade does not belong there. So essence of lemon may contain enough alcohol to produce intoxication, more alcohol proportionately than many kinds of wine or beer. It is possible that a man may get drunk upon it, but it is no intoxicating liquor. Bay rum, Cologne, paregoric tinctures generally, all contain alcohol, but in no fair or reasonable sense are they intoxicating liquors or mixtures thereof."

[6] The proof in the instant case discloses that some of the purchasers of those extracts from D. O. Shows in Crenshaw county, where he was offering the goods for sale, used the same for beverage purposes, diluted and drank the extracts, and became intoxicated thereby. The sale of these extracts may therefore be abused, and, if so, and sold for beverage purposes, constitute a violation of both the state and federal laws. McConnon v. Meadows, supra; W. T. Rawleigh Co. Case, supra; Walker v. Dailey, supra; Joyce, Intoxicating Liquor, § 39.

[7] The above-cited federal statute expressly provides a penalty for—

"any person who shall knowingly sell any of the articles mentioned in paragraphs (a), (b), (c), and (d) * * * for beverage purposes, or any extract or sirup for intoxicating beverage purposes, or who shall sell any of the same under circumstances from which the seller might reasonably deduce the intention of the purchaser to use them for such purposes."

From the evidence as to the quantity of extracts purchased at 'one time and with some frequency by a few of D. O. Shows' customers, we conclude it might be reasonably inferred that said Shows had notice the purchase was for beverage purposes, and therefore the sale was in violation of the law. As to the circumstances of these sales, however, the plaintiffs had no information, so far as this record discloses, and under ordinary circumstances would in no manner be chargeable therewith; nor would it constitute any defense to a suit for the purchase price of the articles. Such was the express holding in McConnon v. Meadows, and W. T. Rawleigh Co. v. Rutkowski, supra, and, indeed, the soundness of this conclusion is not here questioned by counsel for defendants.

[8] Plaintiffs' counsel insist that, though it should appear they had notice or knowledge that D. O. Shows was purchasing these extracts to be sold as beverages in violation of law, that would be insufficient to render the transaction of this sale illegal, requiring to that end some participation on their part in such illegal sales, citing, among other authorities, McWhorter v. Bluthenthal et al, 136 Ala. 568, 33 So. 552, 96 Am. St. Rep. 43. Delivery of these goods was made to D. O. Shows, as contemplated by the contract in a foreign state, and thus constituted an interstate transaction. Harper v. State, 91 Ark. 422, 121 S. W. 737, 25 L. R. A. (N. S.) 669, 18 Ann. Cas. 435.

The authorities relied upon are not here applicable, as the federal statute, above noted, expressly condemns any sale made under circumstances from which the seller might reasonably deduce the intention of the purchaser to use them for beverage purposes. The question, therefore, is one of fact as to whether or not such was the case under the evidence here adduced.

[9] At the time of the contract entered into between plaintiffs and D. O. Shows there is nothing to indicate any intention that these extracts were to be sold for beverage purposes. They merely constituted a portion of their products, which said Shows was to purchase 'for resale, as he might desire to order. We are of the opinion, therefore, that the defense here sought to be established as to illegal sale of these extracts cannot be extended, under the evidence here adduced, as to affect the validity of the contract in its entirety.

[10, 11] The trial court was of the opinion, and so ruled, that the evidence as to sales of these extracts by plaintiffs to D. O. Shows was sufficient for submission to the jury upon the question as to whether or not they had any notice that the extracts were to be disposed of in violation of law, and instructed the jury that, if they so found, recovery could not be had for this portion of the account.

It appears from the proof that these extracts were sold in 4, 7 and 11 ounce bottles. In the inspection of the products, evidence for the plaintiffs is to the effect that the federal authorities also inspected and knew the size bottles, and no complaint appears to have been made, nor does there appear to be any limitation thereon fixed by statute. Some other manufacturers seem to use bottles of like size. D. O. Shows was engaged in selling these products in Crenshaw county (the territory awarded to him), and defendant offered evidence tending to show: That the trade in that territory did not call for or require sales of these extracts in larger quantities than 2-ounce bottles, and that such latter size was usual and customary when sold for culinary purposes; that said Shows purchased more than was reasonably required for the legitimate needs of such territory; that after the first order given on

April 20, 1919, D. O. Shows wrote, in part, to plaintiffs to send one dozen of the large bottles and one dozen of the small bottles of lemon extract by express, as he was out, and that was the best seller, adding: "Rush my order." The amount of goods sold totaled $2,353.67, of which practically one-sixth, to wit, $390, was for these extracts. That plaintiffs wrote D. O. Shows to push the sale of these extracts, and urged him to purchase more goods than he, in fact, did purchase.

In W. T. Rawleigh v. Rutkowski, supra, the one fact that plaintiffs had urged the defendant to sell more medicine to customers than needed for immediate use was relied upon as showing guilty knowledge of its illegal use on plaintiff's part, but was held insufficient. Here, however, a number of facts and circumstances are relied upon, as above noted, and we are of the opinion these facts and circumstances sufficed to justify the trial court in submitting for the jury's determination the question whether or not plaintiffs sold these extracts to D. O. Shows under circumstances from which they might reasonably deduce the intention of said Shows to use them for illegal purposes. The scintilla doctrine prevails in this jurisdiction, and in determining such a question the matter of the weight of the evidence does not enter into consideration, but only as to whether or not it is sufficient for submission to the jury.

[12] Charge 26, refused to plaintiffs, embraces the essentials of the principles herein announced as to the sale by plaintiffs to D. O. Shows of these extracts. Said charge exonerates plaintiffs as to any unlawful purpose in such sale, provided they sold said Shows without notice or knowledge that he intended to make any unlawful use thereof. The criticism of this character of instruction is its failure to follow the language of the above-cited federal statute, "under circumstances from which the seller might reasonably deduce" such unlawful intention; but we think such circumstances would be the equivalent of "notice" as used in the charge as merely a more concise statement of the same principle. This charge should have been given. Its substance is not embraced in any given charge, or the oral charge of the court, and its refusal constitutes reversible error.

[13] As we read refused charge 29, it is practically the same as the charge last discussed, with the additional instruction as to the burden of proof. This charge should also have been given.

[14, 15] The fact that these extracts were known by plaintiffs to be intoxicating, if drunk to such excess, and the size of the bottles, was relevant evidence; nor was it objectionable to permit some of the bottles to be offered in evidence. The size of the bottles and their alcoholic content were ad-mitted, and while as original evidence the testimony that the building in which the extracts were manufactured and plaintiffs' business were in the same building would be inadmissible or irrelevant, yet, as this was elicited on cross-examination, we are not prepared to say there was an abuse of discretion in such ruling.

[16-19] In the contract of guaranty defendants waived all notice, and the fact that plaintiffs had given them no notice that D. O. Shows was in arrears was immaterial, as no such duty rested upon plaintiffs. Such evidence only tended to prejudice plaintiffs' case. This observation likewise applies to assignments of error 91, 93, 95, and 99 which complain of the admission of evidence offered by defendants to the effect they did not know the size of the account, and had no notice plaintiffs were claiming anything of D. O. Shows. So, also, whether D. O. Shows sold the goods for cash or credit was immaterial, there being nothing in the contract concerning that matter (Huckaby v. McConnon, 213 Ala. 631, 105 So. 886), and likewise immaterial whether he owned any property or not, and what profit he was to make on the sale of these products—all of which rulings were of prejudicial character.

[20, 21] There is merit also in assignments 52, 53, 55 and 56. The court sustained defendants' objection to the question propounded to witness Wolfe, who really had charge of the matter of these sales to D. O. Shows, as to whether or not plaintiffs, at the time of such sales to said shows, had any notice or knowledge that these extracts would be used unlawfully. This was a vital question as to a recovery for these extracts, and defendants' evidence was intended to show guilty knowledge on plaintiffs' part. Manifestly a denial of any such notice or knowledge was proper to be admitted. From what we have hereinbefore stated, it appears as our conclusion that evidence tending to show the reasonable needs of such extracts in that territory, the usual size bottles sold there for culinary purposes was properly admitted or offered by defendants.

[22] The contract of guaranty contained no limitations as to the amount for which payment was guaranteed. The reference to "reasonable quantities" as found in the contract between plaintiffs and D. O. Shows, we think, very clearly is to be construed as having reference to the discretion or judgment of the plaintiffs as to the amount, and as not otherwise a limitation thereon.

[23] Plea 7c as amended was subject to the demurrer interposed thereto, but, as this plea was eliminated by the affirmative charge for plaintiffs as to the same, no prejudicial error intervened in overruling the demurrer thereto.

A detailed consideration of the numerous assignments of error would extend this opin-

ion to undue length. What we have herein said should suffice for another trial of the cause.

For the errors indicated, the judgment will be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and MILLer, JJ., concur.