BOLIN, Justice.
Fred G. Eagerton and Nancy Eagerton appeal from a summary judgment in favor of Vision Bank (“the bank”) in the bank’s action seeking enforcement of the Eager-tons’ obligations under certain guaranty contracts. We reverse and remand.

I. Facts and Procedural History

Dotson 10s, LLC, is an Alabama limited liability company organized to operate the Rock Creek Tennis Club located at 142 Clubhouse Drive in Fairhope. John W. Dotson, Jr., and Elizabeth E. Dotson (hereinafter sometimes collectively referred to as “the Dotsons”) are the sole members of Dotson 10s.
On December 9, 2007, Dotson 10s executed a “Multipurpose Note and Security Agreement” with the bank in the amount of $550,677.53 (hereinafter referred to as “the original loan”); the maturity date of the original loan was December 9, 2010. In conjunction with the original loan, the bank obtained unlimited personal guaranties from both John W. Dotson, Jr., and Elizabeth E. Dotson. The bank also obtained limited personal guaranties from both Fred G. Eagerton and Nancy Eager-ton; the Eagertons are Elizabeth Dotson’s parents.[1] The original loan was secured by a mortgage on the real property located at 142 Clubhouse Drive (hereinafter referred to as “the first mortgage”).[2]
On December 11, 2008, Dotson 10s executed a subsequent “Multipurpose Note and Security Agreement” with the bank in the amount of $222,513.56 (hereinafter referred to as “the second loan”); this loan is identified by the bank as loan number 302669.[3] The second loan was guaranteed *302 solely by the Dotsons; the Eagertons neither were parties to the transaction involving the second loan, nor did they execute personal guaranties for the repayment of the second loan. The second loan was secured by what is titled a “2nd Real Estate Mortgage” on the same real property located at 142 Clubhouse Drive (hereinafter referred to as “the second mortgage”).
In April 2009, the bank declared the original loan and the second loan in default and accelerated the balances due under both loans; Dotson 10s failed to pay the balances. The bank filed a breach-of-contract action in the Baldwin Circuit Court against Dotson 10s, as the primary obligor of the original loan and the second loan; the Dotsons, as personal guarantors of the original loan and the second loan; and the Eagertons, as personal guarantors of the original loan.
On May 28, 2009, Dotson 10s filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Alabama (“the bankruptcy court”). On August 25, 2009, Dotson 10s filed with the bankruptcy court its proposed Chapter 11 plan of reorganization, which provided, in part, that the original loan and the second loan would be combined (hereinafter referred to as “the consolidated loan”) and paid in full. The proposed plan states, in pertinent part:
“This class consists of the Allowed Secured Claim of Vision Bank, which claim is secured by 6.5 acre parcel where the clubhouse, tennis courts and swimming pool exist. The two notes comprising this claim and totaling approximately $823,ill will be combined and paid at 6% in equal monthly installments of $5,900 beginning 30 days after confirmation. The notes will be paid in full within 24-0 months.... Vision Bank will retain its lien on the subject property until the debt is paid in full.”
(Emphasis added.)
On December 1, 2009, the bankruptcy court conducted a confirmation hearing regarding the proposed reorganization plan; the Dotsons and certain bank representatives were present at that hearing. Before the hearing, the bank representatives negotiated additional terms that were favorable to the bank. On December 10, 2009, the bankruptcy court entered an order confirming the plan of reorganization, as amended. The order states, in pertinent part:
“(2) The secured claim of Vision Bank is determined to be $795,908.84 as of December 1, 2009; (3) [Dotson 10s] shall pay the secured claim to Vision Bank in equal monthly payments of $6,172.64 per month beginning January 1, 2010. Interest is calculated at 7% per annum. The debt to Vision Bank shall mature and become fully due and payable on January 1, 2012; (4) [Dotson 10s] shall have no grace period. If any payment is not paid on or before the due date, the automatic stay shall terminate and Vision Bank is authorized to immediately foreclose its mortgage without further order of this Court....”[4]
(Emphasis added.) The bank thereafter assigned a new loan number to the consolidated loan.
*303 In March 2010, Dotsons 10s defaulted under the bankruptcy plan, and the bankruptcy court entered an order dismissing the bankruptcy action. On May 12, 2010, the bank conducted a foreclosure sale of the real property pursuant to the bankruptcy court’s order set out above.[5] The bank purchased the real property for $600,000 and applied the proceeds entirely to the consolidated loan.
On July 15, 2010, the Baldwin Circuit Court (hereinafter referred to as “the trial court”), in response to a motion for a summary judgment filed by the bank, entered a partial summary judgment in favor of the bank against Dotson 10s but denied the motion as to the Eagertons. The bank, thereafter, filed another motion for a “final partial summary judgment” against the Eagertons, arguing that the Eagertons were responsible under their guaranty contracts for the deficiency remaining on the consolidated loan after allocation of the foreclosure proceeds to that loan. Specifically, the bank argued that because the original loan represented 71.07% of the consolidated loan, the Eagertons should be liable for 71.07% of the balance remaining on the consolidated loan after application of the foreclosure proceeds, as well as 100% of the interest, attorney fees, etc. The Eagertons moved for a summary judgment as well, arguing as a defense a material alteration of their guaranty contracts. On May 24, 2011, the trial court, apparently relying on the bank’s pro rata theory, entered a partial summary judgment in favor of the bank and against the Eagertons in the amount of $208,906.40. The trial court certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P., specifically reserving jurisdiction to determine at a later date the appropriate amount of attorney fees and costs owed to the bank, if any, relating to its collection efforts.[6] The Eagertons appeal.[7]

II. Standard of Review and Applicable Law

“‘This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied.. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue
*304 Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce “substantial evidence” as to the existence of a genuine issue of material fact. Bass v. SouthTmst Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.’ ”
McKerall v. Kaiser, 60 So.3d 288, 290 (Ala. 2010) (quoting Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala. 2004)).
“Rules governing the interpretation and construction of contracts are applicable in resolving a question as to the interpretation or construction of a guaranty contract. 38 Am.Jur.2d Guaranty, § 70 (1968); Pate v. Merchants Nat’l Bank, 428 So.2d 37 (Ala.1983); Colonial Bank of Alabama v. Coker, 482 So.2d 286 (Ala.1985). ‘[A] guarantor is bound only to the extent and in the manner stated in the contract of guaranty.’ Pate v. Merchants Nat’l Bank, supra, at 39 (quoting Furst v. Shows, 215 Ala. 133, 137, 110 So. 299, 302 (1926)). When the terms of a contract are unambiguous, it is the court’s duty to analyze and determine the meaning of the contract, Pate v. Merchants Nat’l Bank, supra at 39; Birmingham Trust Nat’l Bank v. Midfield Park, Inc., 295 Ala. 136, 138, 325 So.2d 133, 134 (1976); and, when appropriate, those questions may be decided by summary judgment. Williams v. Bank of Oxford, 523 So.2d 367 (Ala. 1988); Medley v. SouthTmst Bank, 500 So.2d 1075 (Ala.1986); Colonial Bank v. Coker, supra.... Absent fraud in the inducement, an absolute guaranty will be enforced according to its terms.... ”
Government St. Lumber Co. v. AmSouth Bank, 553 So.2d 68, 75 (Ala.1989).

III. The Guaranty Contracts

The guaranty contracts executed by the Eagertons are unambiguous, and they expressly provide that the Eagertons agreed to guarantee a very specific “indebtedness.” The pertinent parts of the guaranty contracts state:
“A. If this [box] is checked [as it was by the Eagertons], the Undersigned guarantees to Lender the payment and performance of the debt, liability or obligation of Borrower to Lender evidenced by or arising out of the following: Loan # 784-76 and Loan # 67423 and any extensions, renewals or replacements thereof (hereinafter referred to as the ‘Indebtedness’).[8] “B. If this [box] is checked [as it was by the Dotsons], the Undersigned guarantees to Lender the payment and performance of each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, lia *305 bilities and obligations being hereinafter collectively referred to as the ‘Indebtedness’). Without limitation, this guaranty includes the following described debt(s): _
“The Undersigned further acknowledges and agrees with Lender that:
“4. The liability of the [Eagertons] hereunder, shall be limited to a principal amount of $64.8,363.00 (if unlimited or if no amount is stated, the Undersigned shall be liable for all Indebtedness, without any limitation as to amount), plus accrued interest thereon and all attorneys’ fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned hereunder. The Lender may apply any sums received by or available to Lender on account of the Indebtedness from Borrower or any other person (except the Undersigned), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder. If the liability of the Undersigned is limited to a stated amount pursuant to paragraph 4, any payment made by the Undersigned under this guaranty shall be effective to reduce or discharge such liability only if accompanied by a written transmittal document, received by the Lender, advising the Lender that such payment is made under this guaranty for such purpose.”
(Emphasis added.)
On each of their guaranty contracts, the Eagertons checked the box indicating the applicability of paragraph “A,” which limited their liability to “indebtedness” arising out of loan number 78476, the original loan, as well as any “extensions, renewals or replacements thereof.” Paragraph 4 also limited their maximum liability arising out of the original loan to a principal amount of $648,363. Clearly, the function of paragraph A is to provide a convenient method of limiting the guarantor to a specific indebtedness by describing in the blank space the specific obligation of the guarantor. In contrast, the Dotsons’ guaranty contracts indicated that they were proceeding under the language in paragraph B; their guaranty contracts were unlimited. The language in paragraph B is much broader and extends the guarantor’s liability to “each and every debt, La-bility and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender (whether such debt, Lability or obligation now exists or is hereafter created or incurred ...).”

IV. Discussion

A. Material-Modification Argument

The Eagertons argue that the trial court exceeded its discretion in entering a summary judgment in favor of the bank because, they say, the creation of the consolidated loan materially altered their guaranty contracts and also materiaHy altered their underlying obligations in relation to the original loan. They argue that, because these alterations were made without their knowledge and consent, they should be discharged from further liability under their guaranty contracts. The bank, on the other hand, maintains, among other things, that the consolidated loan was a “replacement note” contemplated by the guaranty contracts and that the Eagertons waived the material-modification defense.
The general rule is that “[a] guarantor is discharged if, without his or her *306 consent, the contract of guaranty is materially altered.” 38A C.J.S. Guaranty § 97, at 704 (2008). In Medley v. SouthTrust Bank of the Quad Cities, 500 So.2d 1075 (Ala.1986), this Court stated that any alteration beyond the terms of the guaranty contract, regardless of injury or benefit to the guarantor, is fatal:
“It is fundamental that the liability of a guarantor will not be extended by implication beyond the terms of his contract. It matters not that he or she sustains no injury or even that it may be for his or her benefit. This Court has said that the guarantor ‘has a right to stand upon the very terms of his contract, and if he does not assent to any variation of it, and a variation is made, it is fatal.’ Russell v. Garrett, 208 Ala. 92, 96-97, 93 So. 711 (1922), quoting Manatee County State Bank v. Weatherly, 144 Ala. 655, 39 So. 988 (1905). See, also, Furst v. Shows, 215 Ala. 133, 110 So. 299 (1926).”
500 So.2d at 1081 (emphasis added). In other words, the general rule regarding guaranties is so strict that courts will not stop to inquire whether any alteration was injurious or beneficial to the guarantor. Courts from various jurisdictions have held likewise. See, e.g., Wigley v. Capital Bank of Southwest Missouri, 887 S.W.2d 715, 724 (Mo.Ct.App.1994) (“[A] guarantor is entitled to strict construction of the guaranty; a material alteration of the obligation guaranteed without the guarantor’s consent will discharge the guarantor; if a change enlarges or lessens the liability, it is material and discharges the guarantor; and courts do not inquire whether the alteration was injurious or beneficial.”). See also Bright v. Mack, 197 Ala. 214, 72 So. 433 (1916) (holding, in a case involving surety liability, that an intentional material change in a contract by the original parties without the consent of the surety discharges the surety).
The Eagertons argue that the Chapter 11 reorganization of Dotson lOs’s debts in the bankruptcy court, i.e., the consolidation of the original loan with the second loan, created a new “indebtedness” and/or contract not encompassed by their guaranty contracts. See Committee of Unsecured Creditors v. Dow Coming Corp., 456 F.3d 668, 676 (6th Cir.2006) (noting that a confirmed bankruptcy plan is “effectively a new contract between the debtor and its creditors”). The Eagertons therefore argue that the creation of this new indebtedness, without their knowledge or consent, operated to discharge them from any further obligations under their guaranty contracts. We agree. The guaranty contracts that the Eagertons executed are unambiguous, and the contracts specifically limited the Eagertons’ liability to only that “indebtedness” arising out of loan number 78476, the original loan, as well as any “extensions, renewals or replacements thereof.” See Beal Bank, S.S.B. v. RBM Co., (No. 03A01-9902-CH-00041, November 30, 1999) (Tenn.Ct.App.1999) (not reported in S.W.3d). In Beal, the Court of Appeals of Tennessee, applying Georgia law, stated:
“Beal Bank argues that the 1993 notes did not operate as a discharge because the notes were issued pursuant to the RBM’s bankruptcy reorganization plan and, so the argument goes, the changes were not consented to by Beal Bank. It is true that the discharge of a principal debtor’s debt in bankruptcy does not of itself discharge the obligation of a guarantor. See Growth Properties of Florida, Ltd. v. Wallace, 310 S.E.2d 715, 718 (Ga.Ct.App.1983); 11 U.S.C. § 524(e) (1993) (discharge of a debt of a debtor in a bankruptcy plan does not discharge the liability of another for the debt). However, this does not mean, regardless of the circumstances, that a guarantor’s obligation cannot be discharged by the *307 execution of promissory notes issued in accordance with a bankruptcy plan.
“... Looking to the specific terms of the guaranties in the instant case, however, we find that Heffernan and Hammond limited their liability to the 1989 note and any renewals, extensions and charges thereof. Heffernan and Hammond did not guarantee the 1989 note with modifications; thus, when the 1989 note was modified pursuant to the bankruptcy reorganization, Heffernan and Hammond were discharged.”
(Emphasis added.)
Similarly, the Eagertons in this case did not guarantee loan number 78476, the original loan, “with modifications.” Thus, once the original loan was modified pursuant to Dotson lOs’s Chapter 11 reorganization, the Eagertons were discharged from any further obligations under their guaranty contracts securing the original loan.
The Eagertons further argue that this new indebtedness substantially increased the principal amount of their risk under their guaranty contracts. Specifically, the language of paragraph 4 limits the Eager-tons’ total liability under their guaranty contracts to the principal sum of $648,868. Paragraph 4 additionally states that “indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, -without affecting or impairing the liability of the Undersigned hereunder.” The scope of the Eagertons’ guaranty contracts, however, was defined in paragraph A, where they agreed to guarantee “the debt, liability or obligation of [Dotsons 10s] to the bank evidenced by or arising out of ... Loan # 78476 ... and any extensions, renewals or replacements thereof (hereinafter referred to as the ‘Indebtedness’ ”). The plain meaning of paragraph A and paragraph 4 is that the Eagertons guaranteed a specific indebtedness, loan number 78476, plus any extensions, renewals, or replacements of that indebtedness, up to a maximum of $648,363. And, although the bank and Dotson 10s between themselves could thereafter create indebtedness in excess of $648,363 without affecting the liability of the Eagertons, the bank and Dotson 10s could not, pursuant to the scope of the Eagertons’ guaranty contracts, increase the Eagertons’ liability to include an additional principal amount ($222,513.56), which they did not personally guarantee and which fell outside the limited scope of their guaranties.[9] See, e.g., Keesling v. T.E.K Partners, LLC, 861 N.E.2d 1246 (Ind.Ct.App.2007) (noting that the guaranty of a specific debt does not extend to include other indebtedness that is not within the manifest intention of the parties). It is clear from the language of their guaranty contracts that the Eager- *308 tons did not intend to guaranty any indebtedness other than that indebtedness arising out of the original loan and any “extensions, renewals or replacements thereof.” As previously stated, once the original loan was modified pursuant to Dotson lOs’s Chapter 11 reorganization, the Eagertons were at that point discharged from any further obligations under their guaranty contracts.[10]

B. Bank’s Replacement-Loan Argument

The bank points out that the Ea-gertons agreed to guarantee the original loan and any “extensions, renewals or replacements thereof.” The bank asserts that the consolidated loan constituted a “replacement” of the original loan.[11] The bank cites four cases for the proposition that courts from other jurisdictions have referred to the term “replacement note” as describing a consolidated note and/or a new note with an increased principal. For example, in Sterling Savings Bank v. Bella Ponte Ciño, LLC, (No. 09-758, Nov. 2, 2010) (D.Or.2010) (not reported in F.Supp.2d), the bank, the obligor, and the guarantors entered into a loan modification and extension agreement, executing a replacement promissory note that increased the principal loan amount to $5,800,000. In Sterling, however, all the
parties, including the guarantors, consented to and executed the replacement note. In 8100 N.W. Expressway, LLC v. Morgan (In re Morgan), 360 B.R. 507, 524-25 (Bankr.N.D.Tex.2007), multiple notes were consolidated into one $15,000,000 note referred to as a “replacement” promissory note. Again, all the parties in Morgan, i.e., the debtor and all the business owners, signed the replacement promissory note for the purpose of consolidating specific debts. In e2 Creditors’ Trust v. Far-ris (In re e2 Communications, Inc.), 320 B.R. 849, 852 (Bankr.N.D.Tex.2004), the debtor and its director entered into a contribution and release agreement providing for the consolidation of five notes in a “replacement note.” In Bellwood v. Dooley, (No. CV01381024, Dec. 6, 2002)(Conn.Super.Ct.2002)(not reported in A.2d), a case in which the plaintiff sought to discharge a lien on her property, the opinion states that “[t]he debt is now reflected in a new, single promissory note which was executed as a replacement of the earlier notes.” In other words, the facts in the cases cited by the bank do not reference situations where, as here, the guaranty contracts limited the guarantor’s liability to a specific indebtedness, the guarantor did not consent to a new indebt *309 edness, and the new indebtedness included a different debt, a portion of which the guarantor did not agree to guarantee. In the instant case, the Eagertons agreed to guarantee only that liability arising out of the original loan and any “replacement” thereof. Any replacement of the original loan with a different indebtedness would necessarily require the Eagertons’ knowledge and consent. We conclude that the consolidated loan was not a replacement loan; it was a new loan.

C. Waiver of Material-Modification Defense

The bank argues that the Eager-tons waived the material-modification defense. Specifically, the bank argues that any modifications to the Eagertons’ guaranty contracts or to the underlying debt do not release the Eagertons from liability because, the bank says, the guaranty contracts anticipated and consented to such modifications. Paragraph 6 of each of the guaranty contracts states that the liability of the undersigned “shall not be affected or impaired by ... any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness .... ”
Paragraph 7 of each of the guaranty contracts states:
“The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obli-gor for such deficiency is discharged pursuant to statute or judicial decision. The undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower’s obligations had not been discharged.”
(Emphasis added.)
The Eagertons agree that they waived any and all defenses relating to the original “indebtedness,” as that term is defined in their guaranty contracts. However, they submit that the waiver provisions contained in their guaranty contracts do not apply to the consolidated loan, especially since the new indebtedness included the second loan, which they did not guarantee. We agree. The Eagertons cite Emrick v. First National Bank of Jones-boro, 324 Ill.App.3d 1109, 756 N.E.2d 914, 258 IlLDec. 640 (2001), a case in which an Illinois court addressed a similar issue. In Emrick, the Appellate Court of Illinois stated:
“The Bank also argues that, pursuant to paragraph seven of Mildred’s guaranty, she waived any defenses she might have had. We disagree. Paragraph seven of the guaranty begins with a general waiver and then more specifically details her waiver of all possible defenses that could be raised by Emrick Trucking or otherwise against the Bank relative to the ‘indebtedness.’ Mildred’s arguments are not centered upon the *310 first loan but upon the fact that she did not guaranty the second loan and should not have had to pay the $80,000 loan. These were not arguments about the legality of the original loan and her guaranty thereof. At best, Mildred waived any defenses she had relative to the original indebtedness. Again, to the extent that the term ‘indebtedness’ was subject to two meanings — the original loan amount or the total of both loans, we construe that ambiguity against the Bank.”
324 Ill.App.8d at 1115, 756 N.E.2d at 919, 258 Ul.Dec. at 645 (emphasis added).
As previously stated, there is no ambiguity regarding the term “indebtedness” as that term is defined in the Eagertons’ guaranty contracts. The indebtedness as defined in the contracts is specifically limited to loan number 78476, the original loan, plus “any extensions, renewals or replacements thereof.” The Eagertons’ argument in this appeal does not concern the legality of the indebtedness associated with the original loan. Instead, their argument relates to the legality of their guaranty contracts as to the consolidated loan, which was created without their consent and which included a loan they did not personally guarantee. Thus, although the Eagertons may have waived any defenses they may have had regarding the original indebtedness, the Eagertons did not waive any defenses regarding the consolidated loan, which was created by the bank and the Dotsons without the Eager-tons’ consent.

V Conclusion

In sum, Dotson 10s and the bank negotiated a new loan that not only changed the legal identity of the original loan, but also altered the Eagertons’ original obligation under their guaranty contracts. The Ea-gertons did not consent to guarantee the second loan, which was combined with the original loan to create the consolidated loan — a new indebtedness. These above-stated alterations occurred without the Ea-gertons’ knowledge and consent. Accordingly, the Eagertons cannot be held personally liable for a loan that no longer exists, i.e., the original loan, nor can they be held personally hable for a loan that is not an extension, renewal, or replacement of the original loan, as defined by their guaranty contracts.
Based on the foregoing, the trial court’s summary judgment against the Eagertons in favor of the bank is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, STUART, PARKER, MAIN, and WISE, JJ., concur.
SHAW, J., concurs in the result.
MURDOCK, J., dissents.

. Fred Eagerton and Nancy Eagerton each signed individual guaranty contracts. Both contracts contain identical language, and we refer to the contracts throughout this opinion in the plural form, i.e., the Eagertons’ guaranty contracts.

. The original loan is actually a renewal of a previous loan executed by Dotson 10s in the amount of $598,363 that matured on December 9, 2007. The documents and the guaranties associated with the previous loan in the amount of $598,363 and the real-estate mortgage securing the previous loan were signed on December 10, 2004. The real-estate mortgage dated December 10, 2004, securing the previous loan is identified as instrument number 858796 and specifically secures “LOAN NUMBER 78476 FOR THE AMOUNT OF $598,363.00.” (Capitalization in original.) This mortgage was subsequently re-recorded as instrument number 866854 to reflect the correction of a typographical error regarding the physical address of the property.

.The second loan is actually a renewal and/or modification of a previous loan executed by Dotson 10s on October 20, 2006, in the amount of $224,000. This previous loan in the amount of $224,000 is identified by the *302 bank as loan number 97950, and it is secured by a mortgage, dated October 20, 2006, and identified as instrument number 1009685. The mortgage specifically secures "LOAN NUMBER 97950 FOR THE AMOUNT OF $224,000.00.”

. We note that the bankruptcy court's order acknowledges neither that the bank held two separate mortgages on the subject real property nor that the first mortgage secured only the original loan.

. The foreclosure deed contained in the record discloses that the bank foreclosed upon the first mortgage — instrument number 858796. See supra note 2.

. Because the guaranty contracts in this case specifically state that the guarantors shall be liable for "all attorneys’ fees, collection costs and enforcement expenses” and because the trial court reserved jurisdiction to determine at a later date the appropriate amount of attorney fees and costs relating to the bank’s collection efforts, we conclude that the summary judgment was final. See Liberty Mut. Ins. Co. v. Greenway Enters., Inc., 23 So.3d 52, 55 (Ala.Civ.App.2009). In Liberty Mutual, the Court of Civil Appeals stated:
"Rule 58(c), Ala. R. Civ. P., states, in pertinent part, that '[tjhe entry of the judgment or order shall not be delayed for the taxing of costs.’ Hence, the failure to tax costs did not affect the finality of the summary judgment. Holman v. Bane, 698 So.2d 117, 119 (Ala. 1997). Pursuant to caselaw, the failure to award attorney fees also does not render the summary judgment nonfinal. See Gonzalez, LLC v. DiVincenti, 844 So.2d 1196, 1201 (Ala.2002) (holding a summary judgment to be final although motion to assess attorney fees remained pending because award of attorney fees is collateral to judgment).”

.The Dotsons have since filed for personal bankruptcy. The underlying action, as it relates to the Dotsons, has been stayed pending action by the bankruptcy court.

. The parties stipulate that loan number 67423 (with an approximate balance of $49,667) was paid in full. Accordingly, the Eagertons' personal liability under their guaranty contracts extends only to loan number 78476 "and any extensions, renewals or replacements thereof....”

. We note that the first mortgage securing the original loan contains a dragnet clause that states that the mortgage secures the original loan as well as "[a]ll future advances from [the bank] to [Dotson 10s] under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this security instrument whether or not this security instrument is specifically referenced.” The Eagertons’ guaranty contracts did not contain this all-inclusive language. No argument is presented to this Court that the Eagertons are responsible for the second loan by virtue of the dragnet clause contained in the first mortgage. Indeed, the Eagertons were not parties to the original loan or the mortgage securing that loan. They only guaranteed the original loan. Accordingly, their liability cannot be extended beyond the terms of their guaranty contracts. See, e.g., Emrick v. First Nat’l Bank of Jonesboro, 324 Ill. App.3d 1109, 756 N.E.2d 914, 258 Ill.Dec. 640 (2001) (noting that, where guarantor executed a guaranty contract in a limited amount referring to a specific loan, guaranty could not be applied to second loan, which was not mentioned in the guaranty contract and to which the guarantor was not a party).

. We note that both sides present arguments regarding the allocation of the foreclosure proceeds. The Eagertons argue that the new indebtedness altered the manner in which any foreclosure proceeds would be allocated in the event of default. The bank argues that the Eagertons are liable for their pro rata share of the remaining balance due on the consolidated loan following application of the foreclosure proceeds. Because the execution of the consolidated loan between the bank and Dotson 10s without the Eagertons’ knowledge or consent operated to discharge the Eager-tons from any further liability under their guaranty contracts, how the foreclosure proceeds were allocated is irrelevant. We, therefore, pretermit any discussion of that issue.

. In its brief on appeal, the bank argues that the Eagertons are precluded from arguing that the consolidated loan is not a replacement loan for the original loan because, it says, the Eagertons failed to argue this point before the trial court — apparently at a May 17, 2010, hearing. The bank notes that the Eagertons argued only that the consolidated loan was not an extension or a renewal of the original loan. A transcript of the May 17, 2010, hearing is not a part of the record on appeal. In any event, the Eagertons maintain that the bank argued before the trial court that the consolidated loan was a replacement loan. Therefore, the trial court considered that argument, and we will address the issue as it is stated in the bank’s brief.